## HEISS *v.* ADAMS.

ADVERSE POSSESSION— HARBOR IMPROVEMENT — UNITED STATES— EJECTMENT—LIMITATIONS.

> After plaintiff had cut an artificial channel across his land, between Lake Michigan and Portage Lake, government engineers took possession of the channel and piers for the purpose of making a harbor of refuge, and for a period of over 20 years remained in hostile possession thereof, to the knowledge of plaintiff and his agents, and the government, through both the legislative and executive departments, repudiated his claim for damages repeatedly. *Held*, that he was barred by limitations from maintaining an action of ejectment against the government engineer in possession in behalf of the government.

Error to Manistee; Rose, J. Submitted June 17, 1907. (Docket No. 103.) Decided October 4, 1907.

Ejectment by Wilhelmina S. A. Heiss against Milton B. Adams, colonel of the United States army, in charge of the United States engineer's office at Grand Rapids, and the Portage Point Assembly. There was judgment for defendants on a verdict directed by the court, and plaintiff brings error. Affirmed.

*Dwight Goss*, for appellant.

*George G. Covell* and *William K. Clute*, for appellees.

BLAIR, J.   This is an action of ejectment for the possession of certain lands alleged in the declaration to comprise eight acres in section 33, Onekema township, Manistee county, in this State.   In November, 1866, the land in question was entered by Andrew T. Shanks and title conveyed to him by the United States.   In April, 1871, the land was conveyed by Shanks and wife to Theodore Heiss, husband of the plaintiff herein, and, in September of the same year, Heiss conveyed the lands to the plaintiff, who still holds the record title thereof.   Across the eight acres extends an artificial channel, which unites Portage Lake with Lake Michigan, and which was constructed in 1871. The defendant Adams is a colonel of the United States Engineering Corps, having charge of the harbor improvements on the east shore of Lake Michigan, and is made defendant by reason of his official position.

Prior to 1871, the outlet of Portage Lake was a creek about a mile north from the present channel.   The old channel through the creek was used principally for logs, although, before the mill and dam were built, small boats went through.   When the dam was built, it prevented boats from passing, but logs were still run through the channel.

When plaintiff's husband constructed the channel through his lands, it reduced the level of Portage Lake about eight feet, so that the original outlet became dry land and has so remained ever since.   Since 1871 the only outlet from Portage Lake to Lake Michigan has been through the present channel.   Plaintiff's husband, who caused the construction of the present channel in 1871, testified:

"I had men employed to open a ditch.   I was not there personally.   I had a man by the name of Schroeder who was united with me in the effort or job to open the chan-

nel to ship timber through. That was our principal object, * * * and while they were making this ditch . I did not stay there but went to Milwaukee and left the work to Mr. Schroeder, my partner in business at the time.

The digging of the ditch—

"Washed a channel 45 feet deep; a United States steamer sailed in through it the next day and that was the result of my work. * * * The width of the land which I bought from north to south was 35 rods, and the distance from one lake to another was about double this distance, about 70 rods. * * * I remained there about a week, I should judge, and then retired back to Milwaukee and left the business to my man there. * * * I paid the taxes as long as I could get the notice of the assessment sent to me. * * *

" Q. You say that each year since 1871 until the present time you have made inquiry with reference to the taxes?

"A. Yes, sir." ·

In 1884 plaintiff received notice from the assessor, "that *the government had taken possession of my land* and there was no assessment on it nor would there be." After ascertaining that the government was making improvements, plaintiff's husband made efforts to obtain compensation for the lands covered by the improvements, through the President, the war department, and Congress. Plaintiff's husband paid $163.88 for the entire tract of 8 acres. The government improvements occupied about 1½ acres. The bills in Congress, introduced at the request of plaintiff's husband, recited that, "the damages sustained by the said owner by the said taking and appropriation amounts to eighty thousand dollars ($80,000)," and appropriated that amount " in payment of the said damages and for the said appropriation." These bills were introduced at every session of Congress from 1884 to 1891.

" Q. Did those congressmen who introduced those bills for you tell you they could get the bills through ?

"A. They all told me they would .try their utmost but could not give me any assurance, and they did try hard, too."

On June 13, 1885, Mr. Heiss received a letter from the office of the chief of engineers, stating "that the State land map shows that the present channel is entirely north of the north line of section 33, and is therefore not covered by the land claimed by you." On November 25, 1885, he received a letter from the United States engineering office at Grand Rapids, in this State, as follows:

"*Sir:* Your letter of the 23d inst. has been received this a. m. The mistake made in locating the land claimed by you at Portage Lake was due to the defective construction of a map on file in this office and which at this time was supposed to be correct. This, I think, has been stated before. By section 5498, Rev. Stat. United States, I am prohibited from furnishing you any information whatever on your claim. 'Common courtesy' has nothing to do with the matter at all."

On May 17, 1886, Mr. Heiss received the following letter:

"*Dear Sir:* The President has received your letter of the 11th inst., but as the matter concerning which you write has been investigated by the war department, under whose supervision it belongs, and as the secretary of war is of the opinion that you have no just claim against the United States, the President is not disposed to interfere with the action already taken nor to institute further proceedings in the case.

"Your enclosure is herewith returned.
                    "Very respectfully,
                         "J. L. LAMONT,
                              "Private Secretary.
"THEODORE HEISS, Esq.,
        "Milwaukee, Wis."

On July 29, 1903, Mr. Heiss received a letter from the secretary of war, as follows:

"*Sir:* Answering your letter of 20th instant, in which you again call attention to your claim for damages for the alleged use of your property at Portage Lake, Michigan, in connection with the work of providing a harbor of refuge, I beg to inform you that the acting chief of engineers, U. S. army, has just submitted a report on the subject, as follows:

" 'The matter has been repeatedly before the department since 1885. It has received careful consideration, and the department has uniformly held that Mr. Heiss has no just claim against the United States, and that if he had, the claim is one which the department is not required to adjust.'

" In view of the foregoing, and the fact that the claim has also been considered by Congress, the department is unable to afford any relief in the premises.

" Very respectfully,
" ELIHU ROOT,
" Secretary of War.
" Mr. THEO. HEISS,
" No. 4 Worth street,
" San Francisco, Cal."

Mr. Heiss purchased the land for the sole purpose of making a channel to transport tanbark and timber, for which he had secured contracts.

"*Q.* You have never seen the channel at all ?
"*A.* Never the government channel."

The last time that Heiss was at the place in question was in the summer of 1872. During all the time from 1871 down to the present time, plaintiff and her husband had been nonresidents of the State of Michigan.

"*Q.* Did you pay a tax in 1877 on a valuation of $44.60 for the purpose of assisting in working on that channel ?
"*A.* A tax ?    That is an infernal lie, whoever said it— I did not.
"*Q.* Was there another district laid out in 1877 that was assessed for carrying on this work ?
"*A.* I know nothing about it.    *    *    *
"*Q.* Do you claim to be the only man that ever did any work or ever paid for work in opening that channel ?
"*A.* Yes, I do, certainly.    I had a partner there.    He might have paid something without my knowing it.    *    *    *
The south pier is not on my land but the north is."

He also testified that if any one used the channel, it was against his will.    Mr. Schroeder, Heiss' partner, testified :

" I was well acquainted with Mr. Heiss; in 1871 I entered into business relations with him; we were to buy

bark, wood, lumber or anything we could make money on. I proposed that we dig a channel where the present channel is. All right, he said, we would go into it. He would put in the money if we would dig the channel. I had no talk with Heiss about it, but I told the people that it was to be a free public channel waterway for everybody. He did not say anything that the people should help dig it; he depended on me to dig the channel. Andrew Shank asked me if it was going to be free to everybody. That was before he gave Heiss a deed. I told the people it would be a free open channel. This channel that was talked about as being free and open to everybody was upon the present site of the channel between Portage Lake and Lake Michigan. People up there contributed lumber and labor in the way of building cribs and piling. Voluntary labor put it in a navigable condition so that boats could run between the two lakes. "About 1877 a tax was proposed upon Onekema township and levied. It was used to drive piles and build cribs to protect the harbor. The pier on the north side stands upon ground that was covered by water. I signed a petition asking the general government to improve that channel. Government improvements were started there about 1880 or 1882. Since the channel was first put through in 1871 it has been used, except when it was filled up with soil, for the passage of all kinds of boats between Portage Lake and Lake Michigan. Portage Lake is a harbor of refuge and has been for many years. I have been through that channel every year since 1871 on boats and no one ever collected any tolls on the channel that I know of."

In 1871, as shown by the records of the proceedings of the board of supervisors of Manistee county, a license for operating a public ferry across this channel was granted by the board of supervisors to Andrew T. Shanks. Mr. Shanks operated this ferry for several years. His widow, who, at the time she testified, was Mrs. Anna Graham, testified that Heiss said that the channel would be open to everybody. She also testified:

"Q. Did you see a petition or, rather, whether Heiss talked about a petition he was circulating and got signatures to it to send to Washington to have the government improve the channel?

"*A.* Yes, sir.

"*Q.* Did you see that?

"*A.* Yes, sir.

"*Q.* Did you see Mr. Heiss circulate it?

"*A.* Mr. Heiss had it at the time I saw it. That is all I know about it.

"*Q.* What did he say with reference to sending that petition to Washington?

"*A.* I don't remember what he said, only he said he was going to send it to Washington."

Since this channel was put through, with the exception of such times as it has been shoaled in temporarily with sand, it has been used by boats of every description for general navigation purposes. Part of the pier on the north side of the channel has been there since 1879 and some government officer has been in continuous possession of the pier property there ever since. Boats from other States and points in Michigan use the harbor. The lands north of the north pier are in possession of no one, so far as this record discloses. The defendant Adams is only in possession for the United States of the north and south pier property. The channel is open for such use for navigation, as the public sees fit to make of it in the way of domestic, interstate, or foreign commerce.

The assessment roll for Onekema township for 1877 shows that the premises in question were assessed upon a valuation of $44.70. "State tax, 11c; school tax, 9c; harbor tax, 45c; total tax, $1.98. Paid by Mr. Heiss." The receipt for the payment of this tax was put in evidence by plaintiff's counsel, and the record in the treasurer's office shows its payment. In 1879, Congress made an appropriation of $10,000 for the purpose of maintaining and improving the channel at Portage Lake, and soon after commenced to improve the channel, and ever since has carried on the work, expending thereon, up until the commencement of this suit, in 1905, a total sum of $369,500.

A map was made in 1878 before the government did any work upon the channel. At that time, the channel existed there between imperfect piers built by local enterprise.

At the close of the testimony, the court directed a verdict in favor of defendants, upon the ground, "that she rested upon her rights so long that the statute of limitations had run, and that after the statute of limitations had run against her claim she could not maintain a suit in this court for the possession of the premises." The plaintiff has brought the record to this court by writ of error, to review, under appropriate assignments of error, the court's direction of a verdict.

We agree with the circuit judge that this action was barred by the statute of limitations. For over 20 years, the defendant and his predecessors, as shown by the undisputed facts, were in the "actual, continued, visible, notorious, distinct and hostile possession" of the property, to the knowledge of the plaintiff or her husband, who represented her. The executive and legislative branches of the Federal government uniformly repudiated his claim and denied its justice. The United States officers in charge of the harbor improvements continued their work in defiance of plaintiff's claims, and the courts were open to him to establish his rights. Having neglected to avail himself of the right to bring his action within the period prescribed by statute, he lost the right to prosecute his suit.

The judgment is affirmed.

MONTGOMERY, OSTRANDER, HOOKER, and MOORE, JJ., concurred.